**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **NOVELPOINT LEARNING LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **No. 6:10-cv-229 JDL** |
| | § | |
| **LEAPFROG ENTERPRISES,** | § | **JURY DEMANDED** |
| **INC., et al,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This claim construction opinion construes the disputed claim terms in U.S. Patent No. 6,330,427 ("the '427 patent"). Plaintiff NovelPoint Learning LLC ("NovelPoint") alleges LeapFrog Enterprises, Inc. and VTech Holdings Limited (collectively, "Defendants") infringe the '427 patent. The parties have presented their claim construction positions (Doc. Nos. 106, 108 & 116).  On January 12, 2012, the Court held a claim construction hearing and heard argument.  For the reasons stated herein, the Court adopts the constructions set forth below.

### OVERVIEW OF THE PATENT

The '427 patent "relates to the field of talking novelty devices or toys." '427 patent at 1:4-5. Specifically, the patent is directed to "a toy with a talking pointer and book." *Id.* at 1:5-6. "Each page [of the book] contains a contact capable of being detected by the audio signal generator [pointer].  The pointer retrieves data from the memory corresponding to the selected page and converts it into an audible signal."  Essentially, the reader uses a pointer, which includes a speaker, to touch a contact on a particular page of a book. *See id.* at 3:64-65.  The information associated with that particular contact is then used to "generate an audible signal that corresponds with the discrete printed subject matter on the selected page of the book." *See id.* at 3:65-4:1.

The intent of the invention is to provide a more stimulating reading experience for children by providing a novelty item or toy, a book, and a sound source, the sound source capable of being removed from the novelty item and producing realistic sounds. *Id.* at 1:25-40. "By permitting the sound source to be removed from the novelty item, the reader, particularly a young child, can more actively and more realistically act out the story along with the characters in the book." *Id.* at 1:35-38.

NovelPoint asserts that Defendants infringe claims 1, 4, 6-10 and 16-24. *See* PL. BRIEF AT 6. Claim 1 of the '427 patent is set forth below as a representative claim with disputed claim terms set forth in bold:

> 1. A novelty device assembly comprising:
> (a) a **novelty character**;
> (b) an audio signal generator **capable of being supported by** the novelty character and including a memory store data and a speaker to provide an audible signal, the audio signal generator having a housing in which the memory and speaker are located; and
> (c) a book separate from the audio signal generator including a plurality of pages having discrete printed information and at least one page containing an **electrical contact** capable of being detected by the audio signal generator which retrieves data from the memory **corresponding to the printed information** on the selected page and converts the data into an audible signal.

'427 patent at 4:24-38 (Claim 1).[1]

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the

---

[1] Originally, Defendants requested that terms "audio signal generator" and capable of closing a circuit" be construed. *See* PL. BRIEF AT 12, 26. However, Defendants later agreed that these terms need not be construed. RESPONSE AT 1, n.2.

patented invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v.Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc.*

3

*v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent"). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window*, 323 F.3d at 994 ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is

4

indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted).   "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

The terms in dispute, and their corresponding constructions, are set forth below.

**I.**   **"electrical contact"[2]**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| an item which may be contacted by another item to ultimately result in the production of an electrical signal | an electricity conducting part that completes or closes an electrical circuit and expressly excludes optical scanning elements |

---

[2] This term is contained in Claims 1, 11 and 21.

5

The primary dispute concerning "electrical contact" is whether the inventor clearly disavowed subject matter relating to "optical scanning technology" during prosecution of the '427 patent. *See* PL. BRIEF AT 18-22. Defendants argue that the patentee expressly narrowed the scope of "electrical contact" during prosecution to exclude optical scanning technology. RESPONSE AT 14-19. NovelPoint, on the other hand, argues that the prosecution history does not reflect "a clear and unmistakable surrender of subject matter." PL. BRIEF AT 19 (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009)).

With regard to the actual construction of the term, NovelPoint argues that its proposal reflects the Examiner's understanding of "electrical contact" at the time of prosecution and Defendants' construction is overly limiting. PL. BRIEF AT 18-19. Defendants counter that intrinsic and extrinsic evidence supports their construction. RESPONSE AT 12.

## A.      Prosecution Disclaimer

Specifically, Defendants argue that by amending the claims to include "electrical" to modify "contact," in addition to distinguishing electrical contacts from bar codes, the patentee clearly disclaimed optical scanning elements from the scope of the '427 patent. RESPONSE AT 16. To escape forfeiture of subject matter, Defendants contend the applicant was required to affirmatively retract the statement distinguishing electrical contact from bar codes/optical scanning elements. *Id.* at 15, 17-18. Finally, Defendants assert that even though the Examiner construed "electrical contact" to include optical scanning elements, the Examiner's remarks have no effect on the patentee's disclaimer. *Id.*

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed

6

during prosecution." *Omega Eng'g*, 334 F.3d at 1323 (internal citations omitted).  However, prosecution disclaimer may not apply after looking at the prosecution history as a whole, which may indicate that the purported disclaimer was merely an isolated statement, lending ambiguity to whether the patent applicant clearly disavowed the particular subject matter. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (citing *Elbex Video, Ltd. v. Sensormatic Elec. Corp.*, 508 F.3d 1366, 1372-73 (Fed. Cir. 2007)).

Plaintiff argues that the facts at hand mirror those set forth in *Ecolab, Inc. v. FMC Corporation*.  The Court agrees.  In *Ecolab*, the Federal Circuit concluded that the patentee had not disclaimed subject matter during prosecution. 569 F.3d at 1343-44.  The patent at issue in *Ecolab* concerned a chemical product containing an antimicrobial compound paracetic acid ("PAA") used to sanitize meat processing facilities. *Id.* at 1340-41.  In the first office action, the Examiner rejected all claims as anticipated and obvious in light of prior art. *Id.* at 1343.  The patentee responded, stating "The peracetic acid is the *sole antimicrobial agent* in the sanitizing solution. . . . Greenley et al. [the prior art] do not teach the use of peracetic acid alone as a sanitizer." *Id.* (internal citations omitted) (emphasis in original).  The Examiner remarked that the claims of the patent were directed to a composition "which consists essentially of" PAA, and concluded that the patent was not limited to compositions containing PAA as the only microbial agent, despite the patentee's response to the First Office Action. *Id.*  The patentee never again repeated the statements purported to disavow the use of multiple PAA agents; in contrast, the patentee argued that the patent at issue was not rendered anticipated or obvious on alternate grounds. *Id.*  The Federal Circuit ultimately concluded that the prosecution history as a whole did not indicate a clear and unmistakable disclaimer:

> A reasonable reader of this prosecution history could conclude that [the patentee's] initial statements that PAA is the sole antimicrobial agent used in its claimed method

> were hyperbolic or erroneous, that the Examiner corrected [the patentee's] error in the following communication, that [the patentee] recognized its error and never again repeated or relied upon the erroneous rationale, and that the claims were allowed for reasons independent of the allegedly disclaiming statements.

*Id.*; *accord Elbex Video*, 508 F.3d at 1372-73 (finding no prosecution disclaimer when the specification did not support the alleged disclaimer, the prosecution history as a whole created potential ambiguities in the purported disavowing statement, and the disclaimer, if true, would have rendered the claimed system inoperable).  In addition, the court noted that the patent specification clearly contradicted the allegedly disclaiming statement, noting that one of ordinary skill in the art would recognize that the various examples of alternative compositions disclosed in the specification were also antimicrobial agents.  *Ecolab*, 569 F.3d at 1344.

The prosecution history of the '427 patent shows that the Examiner initially rejected the application as anticipated by Williams, et al., U.S. Patent No. 5,899,700 ("Williams") because Williams disclosed a novelty device, an audio signal generator system, and a book with "contacts such as (29c)." EXAMINER'S ACTION AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (MAY 10, 2000), EX. 2, ATTACHED TO RESPONSE.  In response, the patentee amended claims to read "an electrical contact," and attempted to distinguish the application from Williams by stating, in relevant part:

> Williams et al. teaches the use of a bar code reader 57, which is part of a computer system 33, to select multimedia material from disk 31 in response to the sensing of the bar codes 29A-C embedded in the printed materials. . . .  Lastly, there is no disclosure of a book having an electrical contact.  Rather, Williams et al. discloses an optical scanning element.

AMENDMENT AND REMARKS AT 2, 4-5, U.S. PATENT APPL. SER. NO. 09/391,780 (SEPT. 11, 2000), EX. 3, ATTACHED TO RESPONSE.  In the subsequent Final Office Action, the Examiner essentially equated the bar codes found in Williams to the electrical contacts claimed by the patentee:

> The book (27) includes contacts such as (29c).  These contacts can be read as
> "electrical contacts", since the contact of the pointer (57) with these contacts will
> ultimately result in the production of an electrical signal in the pointer (57).

EXAMINER'S ACTION AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (FEB. 13, 2001), EX. 4,

ATTACHED TO RESPONSE.  Then, on March 19, 2001, the Examiner conducted a telephonic interview

with the applicant's counsel in which the Examiner suggested describing the novelty character more

specifically, i.e., as a doll, and describing the audio signal generator as being in a type of non-

computer housing, e.g., a pen housing.  EXAMINER'S INTERVIEW SUMMARY AT 1, U.S. PATENT APPL.

SER. NO. 09/391,780 (MAR. 19, 2001), EX. 6, ATTACHED TO RESPONSE.  In the following Final

Amendment and Interview Summary, the patentee did not reiterate the comments differentiating bar

codes from electrical contacts, instead distinguishing the prior art based on the disclosure of a

novelty device and an "audio signal generator with a housing having a memory and speaker."  FINAL

AMENDMENT AND INTERVIEW SUMMARY AT 3,  U.S. PATENT APPL. SER. NO. 09/391,780 (MAY 7,

2001), EX. 5, ATTACHED TO RESPONSE.  The Notice of Allowance then issued on June 1, 2001.

NOTICE OF ALLOWANCE AT 1, EX. 7, ATTACHED TO RESPONSE.

Read in isolation, the patentee's statements seem to abandon "optical scanning elements."

However, in view of the entire prosecution history, it is unclear whether the patentee unambiguously

forfeited such subject matter.  Like the patentee in *Ecolab*, the applicant in this case did not reiterate

any arguments differentiating electrical contacts from optical scanning elements.  Likewise, the

applicant seems to subsequently distinguish Williams on alternate grounds, i.e., the lack of a novelty

device, as well as an "audio signal generator with a housing having a memory and speaker."  The

Notice of Allowance followed without any further amendment to the claim language or any

indication as to why the application was allowed.  Thus, it appears the Examiner allowed the '427

9

patent claims on grounds independent of the patentee's arguments distinguishing electrical contacts from bar codes or optical scanning elements.[3]   The prosecution record is not so clear and unmistakable as to determine that the patentee abandoned "optical scanning elements," excluding them from the scope of the '427 patent claims.  Accordingly, the Court finds that "optical scanning elements" were not disclaimed during prosecution.

Defendants rely heavily on *Springs Window Fashions LP v. Novo Industries, L.P.*, to illustrate that the prosecution history of the '427 patent reflects that the applicant intentionally abandoned optical scanning elements as types of electrical contacts.  In *Springs Window*, the Federal Circuit concluded that the patentee had forfeited subject matter because the applicant made "detailed, consistent, and repeated" statements distinguishing the prior art.  323 F.3d at 996.  After the Examiner initially rejected the patent application, based in part on anticipation and obviousness, the applicant amended both the claim language and the specification to reflect the applicant's comments, which repeatedly emphasized that the invention—a method of trimming window blinds—contained two separate cutters capable of independent movement, something the prior art did not have.  *Id.* at 993-94.  To illustrate the detail with which the applicant distinguished the prior art, an excerpt of the prosecution arguments are below:

> Pluber [prior art] discloses a somewhat simplistic form of guillotine cutter.  All of the blades are mounted on a *single* plate ... operated by a single arm 55.  The *single* plate 22 carries three blades, one for cutting the head rail, one for cutting the blind slats and one for cutting the bottom rail....  Pluber does not provide two separate cutters for cutting (1) the blind slats and bottom rail, and (2) the head rail.  Operation of Pluber would require a very considerable manual effort.  He shows only one movement arm.  This has to move all three cutting blades....  The present invention has been devised to avoid this problem by providing one cutter for the head rail and a separate cutter for the bottom rail and slats.

---

[3] The Court notes that the '427 patent specification is silent regarding optical scanning elements as electrical contacts.

*Id.* (emphasis in original).  The applicant further noted that cutting the head rail required additional effort.  *Id.* at 993.  "It is for this reason that the Applicant provides two entirely separate movement means, one for cutting the head rail and the other for cutting the bottom rail and the blind slats."  *Id.* In the second Office Action, the Examiner rejected the applicant's arguments distinguishing Pluber. *Id.* at 994.  In the subsequent response, the applicant "maintain[ed] the arguments set forth in the prior Amendment concerning distinguishing of Pluber from the claims presented, on the merits," but the applicant nonetheless requested a Notice of Allowance, which the Examiner issued without comment.  *Id.*

*Springs Window* presents a scenario far removed from the situation at hand.  The Federal Circuit reasoned that because the applicant's statements distinguishing the prior art were so detailed, the public notice function served by the patent and its prosecution history would have been undercut; to find no prosecution disclaimer would rob the public, and more specifically, competitors, of the ability to rely on the public record and discern the scope of the invention.  *See id.* at 995-96.  In this case, the purported disavowal amounts to two sentences: "Lastly, there is no disclosure of a book having an electrical contact.  Rather, Williams et al. discloses an optical scanning element." AMENDMENT AND REMARKS AT 2, 4-5, U.S. PATENT APPL. SER. NO. 09/391,780 (SEPT. 11, 2000), EX. 3, ATTACHED TO RESPONSE.  Compared to the detailed, specific statements made by the applicant in *Springs Window*, the statements made by the '427 patent applicant hardly amount to particularized, consistent declarations that clearly and unmistakably disavow optical scanning elements, especially when the applicant's statements were argued once and then dropped.

Further, any disavowing statements made by the applicant in this case are muddied by the remainder of the prosecution history.  Whereas the overall prosecution history in *Springs Window* further reflected an abandonment of claim scope, the prosecution history of the '427 patent does not affirm that the applicant forfeited subject matter.  In *Springs Window*, the applicant repeated his arguments distinguishing the prior art after the Examiner had already rejected them in the second Office Action.  *Id.* at 994.  The court noted that the applicant never retracted any of his detailed, disclaiming statements, nor did he acquiesce to the examiner's comments regarding the scope of the prior art.  *Id.* at 995.  In the case at hand, the Examiner rejected the applicant's arguments, stating that the bar codes in Williams may be considered electrical contacts because the use of bar codes would ultimately result in the production of an electrical signal.  EXAMINER'S ACTION AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (FEB. 13, 2001), EX. 4, ATTACHED TO RESPONSE.  Thereafter, the '427 patent applicant did not repeat any of the previous arguments distinguishing the bar codes of Williams from the electrical contacts claimed in the '427 patent application.  Thus, it seems that the applicant acquiesced to the Examiner's remarks.[4]  In addition, any subsequent communication between the applicant and the Examiner—as far as the record shows—does not discuss "electrical contact" any further.  The record shows that the remaining discussions, and any amendments, concerned the novelty device/character and the audio signal generator.  *See* FINAL AMENDMENT AND INTERVIEW SUMMARY AT 3,  U.S. PATENT APPL. SER. NO. 09/391,780 (MAY 7, 2001), EX. 5, ATTACHED TO RESPONSE; EXAMINER'S INTERVIEW SUMMARY AT 1, U.S. PATENT APPL. SER. NO.

---

[4] However, the applicant's apparent acquiescence cannot be interpreted to mean that the applicant acted as his own lexicographer, including optical scanning elements as "electrical contacts."  The applicant did not "clearly set forth a definition" of "electrical contact" to explicitly include optical scanning elements.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002).

09/391,780 (MAR. 19, 2001), EX. 6, ATTACHED TO RESPONSE.  Pursuant to the Amendment made in

May 2001, the Examiner allowed the '427 patent application, including the amendments to Claims

1 and 11 where "electrical" modifies "contact." [5]  NOTICE OF ALLOWANCE AT 1, EX. 7, ATTACHED

TO RESPONSE.  Consequently, a reasonable reader of the prosecution history would question whether

the applicant unequivocally abandoned optical scanning elements.

In sum, one of skill in the art reading the prosecution history as a whole would not conclude

that the '427 patent applicant clearly and unmistakably disclaimed optical scanning elements as

electrical contacts.

### B.      Construction

Plaintiff seeks to construe "electrical contact" in accordance with a definition set forth by

the Examiner during prosecution.  PL. BRIEF AT 19.  Plaintiff contends that the Examiner's

statements reflect how one of skill in the art would perceive "electrical contact" at the time the

application was filed.  *See id.*  In addition, NovelPoint contends that an "electrical contact" is not

an electricity conducting part.  MARKMAN TRANSCRIPT AT 20:18-20 (Doc. No. 123).  NovelPoint

further argues that the specification allows for the use of alternative types of contacts, including

optical scanning elements.  PL. BRIEF AT  22 (citing '427 patent at 3:6-7).

Although the Examiner's definition of "electrical contact" may provide some indication of

how one of ordinary skill in the art understood the term in 1999 when the '427 patent application

---

[5] As to the addition of "electrical" to modify contact, the Court finds that the amendment does not clearly show disclaimer of optical scanning elements.  As stated above, a reading of the entire prosecution history does not indicate an unambiguous forfeiture of claim scope.  Further, Defendants do not explain how the act of amending the claims in this fashion clearly indicates disclaimer, especially in the context of the prosecution history as a whole. Consequently, the Court finds that amending the claims to include "electrical" is not a critical distinction that shows clear disclaimer of optical scanning elements.

was filed, the "examiner has the duty to police claim language by giving it the broadest reasonable interpretation." *See Springs Window*, 323 F.3d at 995; M.P.E.P. § 2111 ("Claims must be given their broadest reasonable interpretation."). The Court, on the other hand, must strive to determine the proper meaning of the claim term. *See Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("Claim interpretation is the process of giving proper meaning to the claim language."). In this particular instance, the Examiner's construction of "electrical contact" is too broad. The specification does not describe "electrical contact" in the context of producing an electrical signal, as NovelPoint proposes, but rather as something that closes an electrical circuit[6]:

> The contact unit 104 is for use with a contact or book resistor 106 on the book 16. . . . The circuit 100 is a normally opened circuit which becomes closed when switch 110 is closed and the contact unit 104 of the pointer 14 touches the book resistor 106 of the book 16.

'427 patent at 3:6-14. Therefore, when contact unit 104 touches the book resistor 106—an electrical contact—the circuit closes. Defendants' expert, Dr. A. Bruce Buckman concurs and further concludes that resistor 106 is an electricity conducting part. BUCKMAN DECL. AT 8, ATTACHED TO RESPONSE.[7] Dr. Buckman states that a circuit is not closed until "the normally-open switch (110) is closed and the contact unit (104) is put into electrical engagement with the 'resistor on book' (i.e., 'contact') (106). [One of ordinary skill in the art] would further recognize that the items that contact each other to close the circuit are electricity conducting." *Id.*

---

[6] At the hearing, Plaintiff represented it had no problem defining "electrical contact" in terms of closing a circuit:
> MR. JOHNSON: Well, there has to be a closed circuit that occurs somewhere for there to be a production of electrical signal.
> THE COURT: Okay.  Well, why isn't that in the - - the definition?
> MR. JOHNSON: Well, we can include that in the definition, Your Honor.
MARKMAN TRANSCRIPT AT 19:14-20 (Doc. No. 123); *see also, e.g.*, MARKMAN TRANSCRIPT AT 25:14-16.

[7] NovelPoint did not provide an expert declaration.

Definitions from technical dictionaries further support the idea that an electrical contact is an electricity conducting part that completes or closes a circuit.  In *The IEEE Standard Dictionary of Electrical and Electronics Terms*, a "contact" is defined as a "conducting part that co-acts with another conducting part to make or break a circuit." [8]  THE IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS 207 (Jane Radatz et al. eds., 6th ed. 1996).  Further, *The American Heritage Dictionary* defines "contact" in the context of electricity: "4. *Elect.* a. A connection between two conductors that permits a flow of current.  b. A part or device that makes or breaks such a connection." THE AMERICAN HERITAGE DICTIONARY 315 (2d ed. 1982).  Therefore, external evidence indicates that an "electrical contact" both conducts electricity and completes or closes a circuit.

Plaintiff, however, rejects the "electricity conducting part" portion of Defendants' proposal because such a construction would exclude alternative types of contacts, including optical scanning elements.  Specifically, NovelPoint cites, "The contact unit 104 is for use with a contact *or* book resistor 106 on the book 16."  '427 patent at 3:6-7(emphasis added); *see* MARKMAN TRANSCRIPT at 22:19-23:19.  However, the specification consistently discusses "contact" in reference to book resistor 106, an electricity conducting part:

• "To obtain a specific message corresponding to a certain page of the book 16, an impedance of book resistor 106 varies, for example, from one thousand to one million ohms.  When the contact point 44 of the pointer 14 touches the book resistor 106 it electrically connects to an oscillator 112 to cause the oscillator 112 to produce an output waveform at a certain frequency depending on a value of the book resistor 106." '427 patent at 3:15-22.

---

[8] Dr. Buckman declares that "*making* or *breaking* an electrical contact" corresponds to "[c]losing or opening a switch."  In an open circuit, current cannot flow, whereas a closed circuit allows current to flow. BUCKMAN DECL. AT 5-7.

- "[A]n adult or child could depress the bear's paw 30 and the pointer 14 against the book resistor 106. The pointer 14 will detect the value of the resistor 106 and generate an audible signal that corresponds with the discrete printed subject matter on the selected page of the book 16. A user could then depress the bear's paw 31 and the pointer 14 against the bood [sic] resistor 106 found on another page of the book 16. As a result, a second audible signal is generated that corresponds with the text of the next selected page." '427 patent at 3:63-4:5.

The portion of the specification NovelPoint cites is the only language in the specification that may allude to the possibility of alternate types of contacts. Yet, as the portions cited above show, the specification repeatedly discusses "electrical contact" in terms of book resistor 106,[9] which is an electricity conducting part.[10]

For the above stated reasons, the Court concludes that an "electrical contact" is "an electricity conducting part that completes or closes an electrical circuit."

---

[9] The Federal Circuit has "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Falana v. Kent State Univ.*, --- F.3d ----, No. 2011-1198, 2012 WL 171550, at *4 (Fed. Cir. Jan. 23, 2012) (internal citations omitted). However, the only disclosure of "electrical contact" in the '427 patent specification is book resistor 106. Coupled with Dr. Buckman's expert declaration that the book resistor is an electricity conducting part, along with the technical sources cited herein, the Court is not impermissibly limiting "electrical contact" to one embodiment, but rather defining the term as one of ordinary skill in the art would in light of the disclosure.

[10] It is important to note that because the Court construes "electrical contact" as "an electricity conducting part that completes or closes an electrical circuit," the construction necessarily excludes "optical scanning elements." During the *Markman* hearing, Plaintiff's counsel said something to the same effect:

> THE COURT: . . . But the first part of it, an electricity-conducting part, you would say that's not acceptable because of the fact that that would exclude the bar code.
>
> MR. JOHNSON: Right. It would exclude the very - - the very way the examiner interpreted it. The examiner interpreted a contact on the page, that part on the page, which was a bar code, which is not an electricity-conducting part, as being the contact.

MARKMAN TRANSCRIPT AT 24:16-24 (Doc. No. 123).

## II.   "capable of being supported by"[11]

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| integral with, enclosed in, or held in position by | separate from, not attached or removably secured to |

The parties take issue with whether the audio signal generator is separate and removable from the novelty character or whether the audio signal generator is integral with or enclosed in the novelty character.  NovelPoint essentially argues that the audio signal generator and the novelty character can be one in the same (see below)[12] or the audio signal generator may be "held in position by" the novelty character, as depicted in Figure 1 below.  PL. BRIEF AT 13-14.



FIG. I



---

[11] This term is contained in Claims 1, 11 and 16.

[12] Note that this figure is not from the '427 patent, but rather included in a letter from the inventor of the '427 patent to counsel.  *See* EX. 2, ATTACHED TO PL. BRIEF.  The letter is not part of the prosecution history.  The image is merely helpful in understanding Plaintiff's argument.

ILLUSTRATION #1, EX. 2 AT 2, ATTACHED TO PL. BRIEF; '427 patent, FIG. 1.

Defendants, on the other hand, argue that the audio signal generator is separate from the novelty character and is capable of being removed from the novelty character. RESPONSE AT 23-24. However, Defendants take it a step further, contending that the patent applicant forfeited claim scope during prosecution; in amending the claims to distinguish the application from Williams, the applicant abandoned the idea that the audio signal generator could be "capable of being removably secured to" the novelty character. *Id.* at 26.

### A.      Prosecution Disclaimer

As an initial matter, the Court does not find that prosecution disclaimer applies in this instance. In initially rejecting the '427 patent application, the Examiner stated:

> FIG. 2 of William et al. discloses a novelty device (41), an audio signal generator system (57, 31, 33, 43) and a book (27). The audio signal generator (57, 31, 33, 43) is attached by communications cables to the novelty device (41), and thus is removably attached to the novelty device. The portion (33) of the audio signal generator includes a memory. The portion (43) of the audio signal generator constitutes speakers. The portion (57) of the audio signal generator is in the shape of a pointer.

EXAMINER'S ACTION AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (MAY 10, 2000), EX. 2, ATTACHED TO RESPONSE. Thus, as illustrated below, the Examiner equated display 41 to the novelty device claimed in the '427 patent application. *See* WILLIAMS AT 3:38-39, EX. 1, ATTACHED TO RESPONSE.

18



*Fig_1*

WILLIAMS, FIG. 1.  In addition, the Examiner took the audio signal generator claimed by the patent

applicant to be similar to the sum of the components of bar code reader 57, disk 31, computer system

33 and audio speakers 43.  *See* WILLIAMS AT 3:29-30; 3:33; 3:43; and 5:13.

In response to the May 10, 2000 Office Action, the patent applicant proceeded to amend

claims 1 and 16, replacing the language "removably secured to" with "supported by" so that claim

16 ultimately read, in part, "a pointer capable of being supported by the novelty device and including

an audio signal generator having a memory to store data and a speaker to provide an audible signal

. . . ."  AMENDMENT AND REMARKS AT 3, U.S. PATENT APPL. SER. NO. 09/391,780 (SEPT. 11, 2000),

EX. 3, ATTACHED TO RESPONSE.[13]  The applicant further remarked that the components described

in Williams do not amount to an audio signal generator, as claimed in the '427 patent application.

Specifically, the applicant distinguished the audio signal generator by implying it was a single

---

[13] The patentee also amended the language of claim 11, adding "wherein the pointer is capable of being supported by the novelty character."  AMENDMENT AND REMARKS AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (SEPT. 11, 2000), EX. 3, ATTACHED TO RESPONSE.

component that housed both memory and speaker, and further, that bar code reader 57—the Williams equivalent to an audio signal generator—did not include speakers:

> *Williams et al. does not disclose an audio signal generator including a speaker* that is capable of being supported by the novelty character. . . . The pointer 14 includes a generally cylindrical shape that can be supported by the novelty character, e.g. the paw of the paw [sic] of the bear (as shown in Fig. 1). . . .
>
> Williams et al. discloses a bar code reader 57, disk 31, computer system 33, speaker 43 and a book 27. . . . Williams et al. teaches the use of a bar code reader 57, which is part of a computer system 33, to select multimedia material from disk 31 in response to sensing of the bar codes 29A-C embedded in the printed materials. Thereafter, external speakers 43 generate sound signals, *but the speakers 43 are part of the computer system 33, not the bar code reader 57. . . . William et al. discloses a speaker 43 separate from the bar code reader 57. The audio signal generator of Williams et al. includes speakers 43 that are detachable from the computer system 33 and are certainly not part of the bar code reader 57* (see e.g. Fig. 1). As a result, there is no disclosure of an audio signal generator capable of being held supported by a novelty character *and having a speaker.*

*Id.* at 3-4 (emphases added). The applicant's remarks say nothing of whether the audio signal generator no longer has the capability of being "removably secured to" the novelty character. Instead, the applicant distinguishes Williams based on the fact that bar code reader 57 does not include speakers, unlike the audio signal generator claimed in the '427 patent application. The applicant essentially disagrees with the Examiner when he likens the audio signal generator to numerous components within Williams, and in particular, an entire computer system with external speakers. Although bar code reader 57 in Williams is the item most similar to an audio signal generator, the applicant clearly states that bar code reader 57 is unlike the audio signal generator because it does not include speakers. Further, the speakers claimed in Williams may be detached from *the computer system 33*, not the *novelty character*; the Examiner likened the novelty character to display 41. Therefore, the audio signal generator could be capable of being removably attached from the novelty character.

20

Although the Examiner reiterated his arguments concerning Williams in a subsequent Office Action, the Examiner ultimately allowed the '427 patent application. *See* EXAMINER'S ACTION AT 2, U.S. PATENT APPL. SER. NO. 09/391,780 (FEB. 13, 2001), EX. 4, ATTACHED TO RESPONSE; NOTICE OF ALLOWANCE AT 1, EX 7, ATTACHED TO RESPONSE. The applicant made no additional remarks concerning "removably attached" or "supported by," instead commenting again that "none of the cited references disclose the claimed audio signal generator with a housing having a memory *and a speaker*." FINAL AMENDMENT AND INTERVIEW SUMMARY AT 3, U.S. PATENT APPL. SER. NO. 09/391,780 (MAY 7, 2001), EX. 5, ATTACHED TO RESPONSE (emphasis added). Accordingly, the Court finds no clear and unmistakable disclaimer with respect to "removably secured to."

### B.      Construction

The Court finds that "capable of being supported by" needs no construction. As stated above, the applicant did not forfeit the possibility that the audio signal generator may be removably attached to the novelty character. Defendants further note that the specification consistently describes the audio signal generator "as a separate item that is removable from the novelty character." RESPONSE AT 23. For example, the specification states that the purpose of the invention is to "give[] the child a greater feeling of participation in the reading process, and stimulate[] the child's interest in reading." '427 patent at 1:37-39. Such a feat depends on the ability to remove the audio signal generator from the novelty character:

> To provide a more enjoyable and more educational reading experience, it is desired to provide a novelty item or toy such as a stuffed bear or doll, a book, and *a sound source that can be separated, on occasion,* from the novelty item or toy. . . . *By permitting the sounds source to be removed from the novelty item*, the reader, particularly a young child, can more actively and more realistically act out the story along with the characters in the book.

'427 patent at 1:27-37 (emphases added).  Thus, the specification not only notes the importance of the capability of removing the audio signal generator from the novelty character, but it also reflects the language of Claim 11, which specifically states, "a pointer capable of being removably secured to the novelty character and including an audio signal generator . . . wherein the pointer is capable of being supported by the novelty character. . . ."  '427 patent at 4:59-63.

In addition, Figures 1 and 4 show that the audio signal generator may be held in position by the novelty character:

> While a bear 12 is illustrated in FIG. 1, other novelty devices or toys such as a doll as illustrated in FIG. 4 or other characters such as a turtle may also be used with the present invention. . . .  The bear 12 includes a body or torso 20, a head 22, two arms (right and left) 24, 26 and two legs 28, 30.  In the present embodiment, the left arm 26 of the bear 12 holds the pointer 14.  The pointer 14 is sized so as to be secured within the paw 31 of the bear.  Alternatively, the pointer 14 could be secured to the paw 31 using velcro or other suitable securing methods.





'427 patent at 2:49-60; FIGS. 1 & 4.  Thus, the audio signal generator, or pointer, may be held in position by the novelty character or secured to the novelty character.

In sum, the audio signal generator may be separate and removable from the novelty character. However, it must also be capable of being attached to or capable of being held in position by the novelty character.  Having resolved the parties' dispute as to the scope of the term "capable of being supported by," the Court finds that no construction is necessary.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

## III.    "different contact"[14]

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction required.  Ordinary and customary meaning. | an electrical contact that has a different value than another electrical contact in the book |

NovelPoint asserts that "different contact" needs no construction because the specification uses the term in accordance with its plain and ordinary meaning. PL. BRIEF AT 23 (citing '427 patent at 1:62-63; 2:21-22).  In addition, NovelPoint contends that Defendants' proposal inappropriately imposes additional limitations, particularly in defining "different contact" as a different type of *electrical* contact, which is not indicated by the claim language.  *See id.* at 24. NovelPoint further denies Defendants' contention that the term is indefinite.  *See id.* at 23.  According to Defendants, the term is indefinite because neither the claim language nor specification explain what the contact is different from or how the contact is different.  RESPONSE AT 27.

In light of the parties' dispute regarding the scope of "different contact," the Court finds that the term requires construction.  NovelPoint notes that during prosecution, the patentee amended claims 1 and 11 to include "electrical" to modify "contact."  PL. BRIEF AT 24.  However, the patentee did not modify "different contact" with the word "electrical"; therefore, NovelPoint contends, a "different contact" need not be "electrical."  *Id.*  Yet, as stated above, the '427 patent specification discusses "contact" in terms of "electrical contact."  *See supra* pp.15-16.  Further, the specification discloses that "[t]he book includes a plurality of pages having different printed information with each

---

[14] This term is contained in Claim 16 .

page containing a different contact capable of being detected by the pointer." '427 patent at 2:19-22.

Such disclosure is consistent with the language of Claim 16, which reads, in part:

> (c) a book separate from the audio signal generator including a plurality of pages having different printed information and at least one page containing a different contact capable of being detected by the audio signal generator and retrieving data from the memory corresponding to the printed information of the selected page and converting the data into an audible signal.

'427 patent at 5:21-27.  In light of the invention and the specification, it would be nonsensical to interpret "different contact" as anything but a distinct, separate electrical contact.  The Court has already ruled out alternative types of contacts, i.e., non-electricity conducting contacts, and therefore "different contact" must refer to a different electrical contact.  *See supra* p.16.  In the context of the specification, contacts, i.e. book resistor 106, must be different from one another; otherwise the audio signal generator could retrieve the same information from multiple contacts:

> The pointer 14 will detect the value of the resistor 106 and generate an audible signal that corresponds with the discrete printed subject matter on the selected page of the book 16.  A user could then depress the bear's paw 31 and the pointer 14 against the bood [sic] resistor 106 found on *another* page of the book 16.  As a result, a *second* audible signal is generated that corresponds with the text of the *next* selected page.

'427 patent at 3:65-4:5 (emphases added); *see also* 3:15-17 ("To obtain a *specific* message corresponding to a certain page of the book 16, an impedance of book resistor 106 varies, for example, from one thousand to one million ohms.") (emphasis added).  Thus, the specification reveals that an embodiment of the invention may contain a book with several pages, each page containing at least one contact, each contact different from any other contact.  Because each contact is distinct and the only type of contact disclosed in the specification is an electrical contact, the Court finds that

"different contact" is "an electrical contact that is different from another electrical contact in the book."[15]

## IV.    "display"[16]

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction required.  Ordinary and customary meaning. | Defendants contend that the term 'display,' as used in  Claim 21 is indefinite and/or lacks written description and therefore cannot be construed. |

Like the term "different contact," Defendants contend "display" is indefinite. RESPONSE AT 29-30.  In particular, Defendants argue that the word "display" provides no limits with which to interpret the scope of the term, and further, that it lacks written description because "display" is not disclosed in the specification. *Id.* at 30; PL. BRIEF AT 25-26.  NovelPoint asserts that the specification discloses an example of a display and that the term can be understood by its plain and ordinary meaning. PL. BRIEF AT 25.

The Court finds that no construction is necessary; the jury is capable of understanding the plain and ordinary meaning of "display." *See O2 Micro*, 521 F.3d 1362.  Further, the specification describes an example of a display, providing some guidance as to the metes and bounds of the claim term.[17]   Claim 21, the only claim to disclose "display," reads in part, "a display having printed information and an electrical contact." '427 patent at 6:15.  In the specification, a book is described as having both printed information and an electrical  contact: "The book is separate from the audio

---

[15] Because the Court was able to provide a construction for the term "different contact," the Court finds the term is not insolubly ambiguous.  As a result, "different contact" is definite.

[16] This term is contained in Claim 21.

[17] As a result, the Court concludes the term is definite.

signal generator and includes a plurality of pages having discrete printed information."[18] '427 patent at 1:60-62.  The specification further states "The contact unit 104 is for use with a contact or book resistor 106 on the book 16."  '427 patent at 3:6-7.  Thus, the specification contemplates that book 16 is an example of the type of display claimed in Claim 21.

In addition, the '427 patent specification includes language indicating that the patentee contemplated alternate embodiments of the invention:

> The embodiments described above and shown herein are illustrative and not restrictive.  The scope of the invention is indicated by the claims rather than by the foregoing description and attached drawings.  The invention may be embodied in other specific forms without departing from the spirit of the invention.

'427 patent at 4:10-15.  The Court finds that a display is within the metes and bounds of the invention and therefore will not limit "display" to a book simply because the only type of display disclosed is a book.  *See Teleflex, Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002).  Further, "display" is not a technical term that requires interpretation or expert opinion; as stated above, the jury will comprehend the plain and ordinary meaning of the term.  Accordingly, the Court finds that no construction for the term "display" is necessary in light of the specification.

## V.   "novelty character"[19]

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| a toy, device, or item having features that resemble a human or animal | a toy representative of a human or animal |

---

[18] Further showing that a book is a type of display is a different portion of Claim 21, which also describes the audio signal generator as "being physically separate from the display."  *See* '427 patent at 6:14.

[19] This term is contained in Claims 1, 11 and 16.

The primary dispute concerning "novelty character" is whether the character should be limited to toys, excluding devices and items.  NovelPoint asserts that Defendants' construction is too narrow because it improperly limits the "novelty character" to toys only.  PL. BRIEF AT 7.  Defendants, on the other hand, contend that NovelPoint's proposal is too broad, encompassing "devices" and "items," as well as toys, in contravention of the specification, which repeatedly describes toys, e.g., bears and dolls, as the novelty character used in the invention.  RESPONSE AT 19-20.

In light of the Court's other constructions, e.g., "electrical contact" and "capable of being supported by," the Court sees no legitimate dispute regarding the scope of this particular term.  Further, the Court finds that the jury is capable of comprehending "novelty character" as it is plainly understood.  Therefore, the Court declines to construe "novelty character" at this time; however, if necessary, the Court is open to readdressing the issue at a later date.

Accordingly, the Court concludes no construction is necessary for the term "novelty character."

## VI.    "corresponding to the printed information"[20]

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| similar or equivalent to, or descriptive of, information that is in a printed form | Defendants contend that no construction is necessary and this language should be given its plain and ordinary meaning. |

NovelPoint asks that "corresponding to the printed information" be construed because the term, as used in the specification, "has a particularized meaning."  PL. BRIEF AT 27.  Specifically, NovelPoint seeks to clarify the ambiguity of the claim language in light of prior art submitted to the USPTO at the time of prosecution; the "Phonics Fun, Hot Dots Activity Set" describes providing one

---

[20] This term is contained in Claims 1 and 16.

of two types of audio effects depending on whether the user, utilizing a pen, touches the dot corresponding to a correct or incorrect answer.  REPLY AT 10.   NovelPoint wishes to illustrate that "arbitrary sounds that are merely related in some fashion, are not 'corresponding to the printed information.'"  *Id.*  Defendants contend no construction is necessary.  RESPONSE AT 29.

The Court find no construction necessary for "corresponding to the printed information."  The language is not technical and is easily understood.  Therefore, the term is to be given its plain and ordinary meaning.  The Court is willing to revisit the issue at a later date should a legitimate claim scope dispute arise.

### CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above.

**So ORDERED and SIGNED this 27th day of February, 2012.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE